Julie L. Friedberg, (JF 6932)
200 Campus Drive, Suite 210
Florham Park, New Jersey  07932
973-660-4405
*Attorneys for Defendant Pepco Technologies, L.L.C.*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ASCO POWER TECHNOLOGIES, L.P. | ) ) ) ) | Civil Action No.  03-CV-1942 (WHW)(SDW) |
| Plaintiff, | ) ) ) | Return Date:  October 10, 2005 |
| vs. | ) ) ) | |
| PEPCO TECHNOLOGIES, L.L.C., | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT PEPCO TECHNOLOGIES, L.L.C.'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

PROCEDURAL HISTORY.............................................................................................. 4

STATEMENT OF FACTS .............................................................................................. 5
    **A.**   The Parties and the Genesis of Their Relationship ................................. 5
    **B.**   The April 2000 Purchase Order ............................................................. 6
    **C.**   PepTech Submits Tentative Projected Forecasts ................................... 8
    **D.**   Involvement of PepTech Employees in Negotiations with ASCO ...................... 10
    **E.**   PepTech Rejects Invoices for The April 2000 Purchase Order ............................ 10
    **F.**   ASCO Received Offer to Purchase Pre-Manufactured Switches and
        Materials at Issue ................................................................................. 11

ARGUMENT .................................................................................................................. 12
    **I.**   SUMMARY JUDGMENT STANDARD .................................................... 12
    **II.**  THE CLEAR AND UNAMBIGUOUS LANGUAGE OF THE APRIL 2000
        PURCHASE ORDER PRECLUDES PLAINTIFF'S BREACH OF CONTRACT
        CLAIM ...................................................................................................... 13
    **III.** PLAINTIFF'S MISREPRESENTATION AND FRAUD CLAIMS CANNOT
        WITHSTAND SUMMARY JUDGMENT AND MUST BE DISMISSED AS A
        MATTER OF LAW .................................................................................. 18
        **A.**   The April 2000 Purchase Order Precludes ASCO's Fraud and
            Misrepresentation Claims ................................................................ 19
        **B.**   Even if the Fraud and Misrepresentation Counts are not Duplicative,
            Plaintiff Fails to Establish Essential Elements of the Claims ............................. 20
    **IV.** PLAINTIFF'S ACCOUNT STATED CLAIM FAILS BECAUSE PEPTECH
        NEVER ACKNOWLEDGED THE VALIDITY OF THE ACCOUNT ...................... 26
    **V.**  PEPTECH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
        CLAIM FOR QUANTUM MERUIT ...................................................... 27

CONCLUSION.............................................................................................................. 29

i

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Consol. Rail Corp.*,
   297 F.3d 242 (3d Cir. 2002)...................................................................12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).....................................................................12, 13

*Barrer v. Women's Nat'l Bank*,
   761 F.2d 752 (D.C. Cir. 1985).............................................................20

*Bennett v. Kiggins*,
   377 A.2d 57 (D.C. 1977), *cert. denied*, 434 U.S. 1034 (1978).......................20, 21, 22, 23

*Bloomgarden v Coyer*,
   479 F.2d 201 (D.C. 1973)...................................................................28

*Burlington Ins. Co. v Okie Dokie, Inc.*,
   329 F. Supp. 2d 45 (D.D.C. 2004)........................................................21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).....................................................................12, 21

*Clayman v. Goodman Props., Inc.*,
   518 F.2d 1026 (D.C. Cir.1973)..............................................................13

*Dale Denton Real Estate v. Fitzgerald*,
   635 A.2d 925 (D.C. 1993)...................................................................28

*Dawn v. Stern Equipment Co.*,
   134 A.2d. 341 (D.C. 1957)..................................................................26

*Democratic Nat'l Comm. v. McCord*,
   416 F. Supp. 505 (D.D.C. 1976)...........................................................24

*Dorsky Hodgson & Partners, Inc. v. Nat'l Council of Senior Citizens*,
   766 A.2d 54 (D.C. 2001).....................................................................28

*Duffy v. Charles Schwab & Co., Inc.*,
   123 F. Supp. 2d 802 (D.N.J. 2000).......................................................27

*E.P. Hinkel & Co. v. Manhattan Co.*,
   506 F.2d 201 (D.C. 1974).............................................................13, 14, 18

*Exxon Corp. v. Int'l Concrete Corp.*,

335 A.2d 236 (D.C. 1975) ..................................................................26

*Falcone v. Paradiso,*
54 F.2d 715 (D.C. 1931) ..................................................................26

*Hercules & Co. v. Shama Rest. Corp.,*
613 A.2d 916 (D.C. 1992) ..........................................................21, 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ........................................................................13

*Moser v. Milner Hotels, Inc.,*
6 N.J. 278 (1951) ............................................................................27

*NRM Corp. v. Hercules Inc.,*
758 F.2d 676 (D.C. Cir. 1985) ....................................................13, 14

*Nader v. Allegheny Airlines, Inc.,*
626 F.2d 1031 (D.C. Cir. 1980) ......................................................20

*National Realty Corp., v. Impact Advertising Inc.,*
206 A.2d 579 (D.C. 1965) ..........................................................26, 27

*Railan v. Katyal,*
766 A.2d 998 (D.C. 2001) ..............................................................20

*Reed Research, Inc. v. Int'l Concrete Corp.,*
243 F.2d 602 (D.C. Cir. 1957) ........................................................26

*Regency Communic'ns Inc., v. Cleartel Communic'ns Inc.,*
160 F. Supp. 2d 36 (D.D.C. 2001) ..............................................19, 20

*Travelers Indemnity Co. v. Booker,*
1986 U.S. Dist. LEXIS 30945 (D.D.C. 1986) ................................14, 18

*Triple Point Technology, Inc. v. D.N.L. Risk Management, Inc.,*
2000 W.L. 1236227 (D.N.J. 2000) ....................................................19

*United Mine Workers of America 1974 Pension v. Pittston Co.,*
984 F.2d 469 (D.C. Cir. 1993) ....................................................14, 15

*Washington Metro. Area Transit Auth. v. Mergentime Corp.,*
626 F.2d 959 (D.C. Cir. 1990) ........................................................13

## STATUTES

28 U.S.C. §§ 1332(a)(1).................................................................................................................4

Fed. R. Civ. P. Rule 56(c)...........................................................................................................12

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant PEPCO

Technologies L.L.C. ("PepTech") respectfully submits this memorandum of law in support of its

motion for summary judgment seeking dismissal of all counts of Plaintiff Asco Power

Technologies, L.P.'s ("ASCO") Complaint as a matter of law.

## PRELIMINARY STATEMENT

This case arises out of a purchase order contract entered into by PepTech, a newly formed

start-up enterprise in the power industry, and ASCO, an electrical component part manufacturer.

PepTech was created for the purpose of manufacturing and selling the GenerLink, a small, never

before utilized, device that utility companies can attach to a homeowner's electric meter to allow

the homeowner to easily connect to a generator in the event of a power outage.  ASCO

manufactures utility disconnect switches, a component part of the GenerLink.  Although

PepTech had prepared a business plan in connection with its formation, which estimated product

needs based upon an anticipated customer base, PepTech had – and ASCO was aware that

PepTech had – no established market.

On or about April 26, 2000, PepTech and ASCO negotiated and entered into a purchase

order for the potential supply of up to 10,000 utility disconnect switches to be potentially

manufactured and delivered at different times over the contract term based upon customer

demand ("April 2000 Purchase Order").  The parties negotiated a volume discount under the

April 2000 Purchase Order whereby the price was set at $68 per switch if PepTech ultimately

ordered and ASCO manufactured and delivered all 10,000 units.  The price increased to $74.50

per unit if fewer than 10,000 units were ordered, manufactured and delivered.

The parties also agreed to terms in the April 2000 Purchase Order that addressed the

market uncertainties that accompanied this new venture.  Specifically, under the April 2000

Purchase Order, ASCO was not required to manufacture – and PepTech was not required to

1

purchase – switches unless PepTech issued a timely and specific written request for the manufacture of a certain number of switch units.  The April 2000 Purchase Order also expressly cautioned ASCO not to make any irrevocable commitment for materials, not to fabricate units in advance of the time necessary to meet PepTech's projected needs, and not to anticipate PepTech's requirements.  Thus, under the clear terms of the April 2000 Purchase Order, ASCO was to bear the financial risk of any material purchase or manufacture of switches in advance of a written authorization from PepTech.

Notwithstanding -- indeed, directly contrary to -- the express terms of the April 2000 Purchase Order, ASCO prematurely obtained materials and manufactured switches in anticipation of PepTech's product needs, and now seeks to charge PepTech for those items.  It is undisputed, however, that no written request was ever issued by PepTech for the manufacture of these units.  It is also undisputed that PepTech never authorized the purchase of these materials.  Despite these facts, ASCO now improperly seeks to hold PepTech liable for its unauthorized business decision to manufacture switches and procure materials under claims of breach of contract, negligent and fraudulent misrepresentation, account stated and *quantum meruit*.  Well established law and the evidentiary record preclude ASCO from succeeding on any of these claims.

ASCO's breach of contract claim fails for one simple reason:  there was no breach.  It is undisputed that PepTech never authorized ASCO in writing to purchase the materials or fabricate the products for which ASCO now seeks compensation, as required by the terms of the April 2000 Purchase Order.  It is further undisputed that PepTech never agreed to pay for ASCO's unauthorized production.  Indeed, the April 2000 Purchase Order expressly provides that

2

PepTech will *not* be liable for any such unauthorized production.  Consequently, ASCO's breach of contract claim must fail.

ASCO's misrepresentation and fraud claims are equally unsupportable.  First, there is no evidence in the record to support independent causes of action for fraud and misrepresentation, as these claims are duplicative of the breach of contract cause of action.  Second, even if these tort claims can survive in addition to the contract claim, there is no evidence that (1) PepTech made a false representation; (2) ASCO reasonably relied on any such representation; or (3) that PepTech intended to deceive ASCO, essential elements to the success of these tort causes of action.  As such, ASCO's fraud and misrepresentation counts also fail.

ASCO's account stated claim also fails because PepTech never acknowledged the validity of the debt, a key element of such a claim.  To the contrary, PepTech expressly rejected that debt -- the invoice ASCO submitted to PepTech for damage it allegedly seeks here  -- a fact which defeats this claim.

Lastly, ASCO's *quantum meruit* cause of action fails because the April 2000 Purchase Order is a valid, unrescinded, express contract, the terms of which govern the rights of the parties.  As such, a quasi-contract theory of recovery cannot be maintained.  Furthermore, PepTech derived no benefit from ASCO's unauthorized actions.  Indeed, PepTech does not possess any of the switches for which ASCO claims PepTech is liable in payment -- ASCO does.  Consequently, the *quantum meruit* claim fails as well.

For these reasons, and as more fully demonstrated below, ASCO's claims against PepTech fail as a matter of law and, as such summary judgment must be granted in favor of PepTech.

## PROCEDURAL HISTORY

ASCO initially filed this Complaint against PepTech in the Superior Court of New Jersey, Morris County on March 12, 2003. *See* Complaint, attached as Exh. 1 to the Declaration of Melissa C. Lesmes dated September 9, 2005 ("Lesmes Decl.").[1] The Complaint alleges claims for breach of contract (First Count), negligent misrepresentation (Second and Fifth Counts), account stated (Third Count), fraud (Fourth Count) and *quantum meruit* (Sixth Count).

The action was removed to this United States District Court for the District of New Jersey on April 30, 2003 pursuant to 28 U.S.C. §§ 1332(a)(1) and 1441 et seq. *See* Notice of Removal, Lesmes Decl. Exh. 4. On May 7, 2003, PepTech filed and served its Answer, denying that Plaintiff is entitled to any relief. *See* Answer, Lesmes Decl. Exh. 5.

Discovery in this case began in October 2003. ASCO took the depositions of Bradley Johnson on December 9, 2004 ("Johnson Dep."), Robert S. Stewart on December 10, 2004 ("Stewart Dep."), and Mark Baird on March 2, 2005 ("Baird Dep."). *See* Lesmes Decl. Exhs. 6-8. PepTech took the deposition of ASCO employee, Jason Thorne, on March 8, 2005 ("Thorne Dep."). *See* Lesmes Decl. Exh. 9. The evidence in these depositions and discovery unequivocally establishes that PepTech did not authorize ASCO to purchase materials or manufacture the units at issue in this case. Rather, ASCO took a business risk for which it now seeks to improperly hold PepTech liable. With discovery now completed, it is clear that plaintiff cannot make out any of its claims for damages.

---

[1]     Two individual defendants, Bradley Johnson and Mark Baird, were also named in the complaint. Both Johnson and Baird were dismissed by this Court for lack of personal jurisdiction. *See* the Report and Recommendation of Magistrate Judge Wigenton and the Order signed by Judge Walls attached to the Lesmes Decl. as Exhs. 2 and 3, respectively.

## STATEMENT OF FACTS

A.    **The Parties and the Genesis of Their Relationship**

PepTech was a limited liability start-up company, formed on April 13, 1999 for the

purpose of advancing a new and never before commercially marketed product known as the

GenerLink.  Statement of Undisputed Material Facts ("UF") at ¶¶ 1-3.  The GenerLink is a small,

collar device that utility companies can insert between a homeowner's electric meter and the

meter socket which enables the homeowner to supply power to the home during a power outage

by easily connecting a small generator.  UF ¶ 3.  When connected to a generator, GenerLink

automatically disconnects the home from the electric utility grid and allows the homeowner to

select specific appliances for operation.  *Id.*  ASCO, a self-proclaimed world leader in power

transfer technology, manufactured a component switch, known as a standard 913 disconnect

switch, that PepTech used in the GenerLink.  UF ¶ 4.  ASCO had supplied limited quantities of

its switches during the development and prototype phase of the GenerLink.

As a start-up company, PepTech had no established customer base.  UF ¶6.  On

December 14, 1999, PepTech informed ASCO that under its business plan for 2000 PepTech

wanted "to be prepared to build *approximately* 20,000 Generlinks over a 12 month period" and

estimated that its "quarterly production *could be*":  3,000 Generlinks for the 1st Quarter, 4,000

Generlinks for the 2nd Quarter, 6,000 Generlinks for the 3rd Quarter, and 7,000 Generlinks for the

4th Quarter.  UF ¶ 8.  PepTech requested that ASCO confirm that it had the available capacity to

supply these quantities of switches in the year 2000, should demand meet estimates, and inquired

what lead times or other information PepTech would need to supply ASCO to help meet these

requirements.  *Id.*  ASCO's district manager, Jason Thorne, testified in deposition that ASCO

understood PepTech's December 14, 1999 letter to be a "formal request" for "generic

information," not a request for a commitment or shipping release.  UF ¶ 9.

B.    **The April 2000 Purchase Order**

Under PepTech's business model, PepTech expected that, over time, the GenerLink would develop a steady customer base and that PepTech would ramp up its product needs as that customer base grew.  UF ¶¶ 6, 10.  PepTech and ASCO were cognizant, however, that with GenerLink still in its infancy and without historical data or information upon which to forecast future needs and/or sales, there were no guarantees.  UF ¶ 7.  PepTech and ASCO then negotiated the April 2000 Purchase Order, including its terms and conditions, to protect against these market uncertainties.  UF ¶ 10.  Specifically, PepTech wanted firm commitments from customers for the manufacture of GenerLinks before it issued orders to ASCO to begin manufacturing the component parts.  UF ¶ 6.

On or about April 26, 2000, PepTech submitted the April 2000 Purchase Order for a potential supply of up to 10,000 utility disconnect switches, Model No. 913216060X, for a volume price of $68.00 per unit.[2]  "[I]f Ship Requests for 10,000 units [were] not released during the term of the contract," which expired on September 15, 2001, the unit price would increase to $74.50 per switch for those switches ordered and released to PepTech during this period.  UF ¶¶ 11-12.  In other words, if all 10,000 units were ordered, manufactured and supplied to PepTech by September 15, 2001, PepTech received the per unit discount price.  If fewer than 10,000 units were ordered, manufactured and delivered during this time period, PepTech would be charged the higher price for the units delivered.  Nonetheless, it was clear that PepTech was only responsible to pay for units that PepTech actually ordered and took possession of.  UF ¶¶ 12-13.

---

[2]      The April 2000 Purchase Order incorporated by reference Attachments A and B, including the General Terms and Conditions.  UF ¶16.

Orders by PepTech for the manufacture and delivery of ASCO switches, and ASCO's
duty to fabricate and deliver, were expressly defined under paragraph 11 of the April 2000
Purchase Order, entitled "Delivery, Scheduling, Fabrication and Material Commitment":

> *Deliveries are to be scheduled as requested in writing ("Ship
> Requests"), with production of units to be made to meet Ship
> Requests in the time specified in Attachment B. Ship Requests are
> to be of a size as specified in Attachment B.* Unless otherwise
> authorized *by prior written consent* by Purchaser, Supplier shall
> neither make *irrevocable* commitments for materials or services
> nor fabricate in advance of time necessary *to meet Ship Requests.*
> It is Supplier's responsibility to comply with *these terms*, but not to
> anticipate Purchaser's requirements.

UF ¶16, (emphasis added).[3]  In short, paragraph 11 expressly provides that ASCO was only
obligated to manufacture and deliver – and PepTech only required to pay for – switches ordered
by PepTech in writing at least four weeks in advance of the requested delivery date. *Id.*  Indeed,
paragraph 11 expressly cautions ASCO against any premature purchase of materials or
manufacture of switches by ASCO without PepTech's express written authorization.  The April
2000 Purchase Order ensured that PepTech's inventory levels and purchase obligations did not
outstretch its firm customer purchase commitments.  UF ¶17.  And, paragraph 11 further ensured
that PepTech would not be responsible for ASCO's conduct in anticipation of uncertain market
demand.

The Purchase Order further provided that changes to the terms and conditions of the
Order had to be made in writing and agreed to by both parties:  "No change to this Order shall be
effective unless agreed to in writing in advance by both parties."  UF ¶ 20.

The Purchase Order also contained a provision allowing PepTech to terminate for
convenience.  UF ¶18.  In that case, PepTech was only responsible for the reasonable and actual

---

[3]   "Attachment B" to the Purchase Order is an unexecuted "Projected Demand Schedule" and Ship Request
form.  Attachment B notes that Ship Requests are to be issued "at least four week prior to required delivery date."
Attachment B also identifies PepTech's "Authorized Representative" as "Bradley W. Johnson, President." UF ¶ 19.

costs incurred on orders that had been released for manufacture: "If this Order is terminated for convenience, any claim of Supplier shall be settled on the basis of reasonable, direct costs . . . incurred. . . .  Supplier's direct cost shall include solely actual costs incurred to fulfill Ship Requests . . . ."  *Id.*

     C.     **PepTech Submits Tentative Projected Forecasts**

When ASCO received the April 2000 Purchase Order, ASCO referred to the purchase order as a "*[p]reliminary* order for 10,000" pieces and directed its factory to put a "3A hold" on the order -- "*please do not enter yet*."  UF ¶ 21 (emphasis added).  Mr. Thorne testified in deposition that a "3A hold" is a hold for approval code that ASCO uses in its system to alert its factory that it has received a preliminary order for product.  UF ¶ 22. That order, or any part of it, however, was not to be manufactured until ASCO received a written release to manufacture from its client.  *Id.*  As Mr. Thorne stated, the order was "not to [be] release[d] to manufacture for whatever reason until it's released." *Id.*

After the issuance of the April 2000 Purchase Order, from time to time and under pressure from ASCO to provide information, PepTech provided ASCO with verbal forecasts (as opposed to releases) in the form of <u>tentative</u> release dates.  These dates and forecast of needs changed frequently in accordance with then-perceived market demands. UF ¶ 23.  Specifically, Mr. Thorne testified that ASCO "had been receiving ongoing forecast release schedules, but ... – they were *constantly changing*."  Thorne Dep. 71:10-12, *id.* (emphasis added).  Mr. Thorne confirmed this fact in internal ASCO email communications:  "I have talked with both Michael Bufalini and Mark Baird at PEPCO and they are looking at the following *tentative* release schedule ...This is *subject to change*, because California has asked for several thousand of these, but no one wants to sell to a Bankrupt utility."  Email from Jason Thorne to Richard Mayock re: PEPCO Technologies – tentative release schedule dated January 31, 2001 (000100), *id.*

(emphasis added).  Indeed, PepTech's senior engineer and project manager, Robert Stewart testified that it was PepTech's business practice to only authorize for manufacture and release, switches that it needed for testing or for production of GenerLinks when PepTech had firm commitments from a customer in the form of orders, not just a promise to purchase.  UF ¶ 6. And, although PepTech was negotiating with a number of potential customers, PepTech had not received orders.  Thus, its forecasts were just that – forecasts of possible needs -- based on those ever fluctuating negotiations.  This is precisely what the April 2000 Purchase Order envisioned when it was agreed to.

     As of August 2000, ASCO acknowledged that PepTech's order was still on "3A hold" and not released for production or shipment.  UF ¶ 24.  ASCO's product marketing manager, Richard Mayock, expressed concern over PepTech's unwillingness to commit to firm release dates and sought to compel PepTech to provide confirmed release dates for its projected needs by threatening to assess and impose carrying charges.  UF ¶ 26.  In response to Mr. Mayock's actions, Mr. Thorne pointed out to Mr. Mayock and other ASCO personnel that the tentative dates, about which Mr. Mayock complained, were imposed by and indeed consistent with ASCO company policy, as well as the April 2000 Purchase Order:

> 1) This order was entered "HOLD FOR RELEASE" and anticipated requests dates were included.  These dates are now a requirement for all "HOLD FOR RELEASE" orders and were our best projections possible at the time.  Due to some unforeseen complications and market setbacks, these dates had to be changed.  <u>PEPCO has not released any orders for manufacture</u> and they have been working with us on their forecast projection.  Now we are turning to them and <u>demanding that they except</u> [sic] <u>material on which they have not authorized manufacture</u>.  This was my concern in giving anticipated "customer request" dates, the factory would use these dates to manufacture material and then force the customer to take delivery.  <u>WE CAN NOT DO THIS</u>!!  The field will be forced to leave the "anticipated request" date off the order.

UF ¶ 27(emphasis added).

D.    **Involvement of PepTech Employees in Negotiations with ASCO**

Brad Johnson, the president of PepTech from May 1999 until the sale of substantially all of its assets in August 2002, was PepTech's authorized representative and the employee authorized to order the manufacture and delivery of large quantities of switches like that claimed by ASCO in its complaint from ASCO. UF ¶¶ 28-29. Mr. Johnson never authorized in writing the purchase of materials or manufacture of units claimed by ASCO in its Complaint, nor made any verbal commitments to purchase the same units. UF ¶ 30. Mr. Johnson did not directly participate in the negotiations of the April 2000 Purchase Order and did not have any conversation with any ASCO employee regarding the proposed purchase of disconnect switches that could be construed as false or misleading. UF ¶¶ 32-33.

Likewise, no other PepTech employee ever made a firm commitment to ASCO for the units claimed by ASCO in its Complaint. UF ¶ 31. Mark Baird was a Production Analyst during his tenure at PepTech and his duties consisted of entering purchase orders into PepTech's computer system and forwarding such purchase orders to various vendors. UF ¶¶ 34-35. Indeed, Mr. Baird could not make any management decisions on behalf of PepTech and had no authority to, nor did he, make firm purchase order commitments in connection with GenerLink, *i.e.*, he had no authority to approve any purchase orders on behalf of PepTech; and never represented to ASCO that he had any authority to make such firm purchase decisions. UF ¶¶ 36-37. Nor was Mr. Baird involved in the negotiations or discussions relating to any agreement, contract or purchase order that is at issue here. UF ¶ 38.

E.    **PepTech Rejects Invoices for The April 2000 Purchase Order**

Shortly after the contract term of the April 2000 Purchase Order expired on September 15, 2001, ASCO sent a letter to PepTech indicating that PepTech had not purchased the 10,000 units referenced in the April 2000 Purchase Order by the completion date and represented that

ASCO had incurred costs for certain "completed switches and parts inventory it had on hand to build and ship 3,000 units to meet PepTech's projected demand." UF ¶ 39.  ASCO unilaterally and without any contractual basis levied a cancellation charge of $170,000 against PepTech.  *Id.*

On November 14, 2001, PepTech informed ASCO that, because of uncertainties in the market, PepTech had halted its GenerLink operations and decided to sell the GenerLink patent and technology to a third party. UF ¶ 40.  PepTech also provided ASCO with "formal notice" of PepTech's "rejection of ASCO Invoice No. 453" in the amount of $97,750 which PepTech stated "reflects certain manufacturing equipment and inventory acquired by ASCO without proper prior written approval by [PepTech]." PepTech directed ASCO to paragraph 11 of the Terms and Conditions of the April 2000 Purchase Order, Attachment A, and informed ASCO:

> Absent such a prior written consent authorizing ASCO's materials acquisitions, Pepco Technologies has no obligation to pay for any such related costs. Accordingly as the materials reflected in ASCO Invoice # 453 were neither requested by nor approved in advance for the acquisition by Pepco Technologies, we are unable to accept financial responsibility for their costs.

UF ¶ 41.

F.   **ASCO Received Offer to Purchase Pre-Manufactured Switches and Materials at Issue**

On August 2, 2002, PepTech sold substantially all of its assets to Electric Power Research Institute, Inc. ("EPRI") and effectively ceased operations. UF ¶ 42.  On June 30, 2003, EPRI granted a license to manufacture and market GenerLink in North America to Global Power Products ("Global Power"), a developer of electricity metering equipment. UF ¶ 43.  Mark Matyac, the President and CEO of Global Power Products, extended an offer to ASCO on September 14, 2004 to purchase the ASCO disconnect switches in ASCO's inventory:

> As you know, Global Power Products, Inc. inherited the GenerLink product line from PEPCO Technologies LTD. As President of Global Power Products, Inc., it is my desire to continue the GenerLink product line using the same ASCO 913 disconnect switch as PEPCO designed into the GenerLink.  We would like to

> submit a Purchase Order for the exact part number of the 913 disconnect switch of which ASCO currently has 500 in stock and unassembled parts in inventory to build additional 913 disconnect switches for the GenerLink product. We are requesting quantities of at least 2400 units per year. We have an immediate need for 200 units and are more than willing to take the completed switches you have in inventory to fill our new order.

UF ¶ 44.  PepTech understands that the supply of materials and units for which ASCO is seeking payment from PepTech has now been sold to Global Power.  UF ¶ 45.

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

The United States Supreme Court has held that summary judgment is an effective tool to weed out factually insufficient cases that should not go to the jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate if the moving party "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(c).  A genuine issue is not established unless the evidence, viewed in a light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).

Summary judgment is particularly appropriate -- as it is here -- if, after discovery has been concluded, the non-moving party cannot put forth any facts establishing a required element of its cause of action and with respect to which it has the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23; *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002).  Moreover, in opposing summary judgment, a party cannot merely rest upon the allegations or denials of its pleadings or offer conclusory or unsupported assertions, but must set forth "significant probative evidence" showing that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-250; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986) (the party opposing summary judgment must present more than a "metaphysical

doubt" about the material facts). As demonstrated below, ASCO fails to offer any evidence

legally sufficient to support the counts of its Complaint. As such, those counts fail as a matter of

law and PepTech's motion for summary judgment must be granted.

## II.     THE CLEAR AND UNAMBIGUOUS LANGUAGE OF THE APRIL 2000 PURCHASE ORDER PRECLUDES PLAINTIFF'S BREACH OF CONTRACT CLAIM

It is well established law that the court -- not a jury -- must interpret unambiguous

contractual provisions like those at issue here.[4] *E.P. Hinkel & Co. v. Manhattan Co.*, 506 F.2d

201, 204 (D.C. 1974); *see also NRM Corp. v. Hercules Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985)

("interpretation of a facially clear contract is considered a question of law and is for the court");

*Clayman v. Goodman Props., Inc.*, 518 F.2d 1026, 1034 (D.C. Cir.1973) ("Construction of

unambiguous features of a written contract is a problem for the court, not the jury. Put another

way, the legal effect of reasonably clear terms of a contract is a question of law for judges"). In

performing this task, "the Court should construe the contract as a whole so as to give meaning to

all of the express terms." *Washington Metro. Area Transit Auth. v. Mergentime Corp.*, 626 F.2d

959, 961 (D.C. Cir. 1990).

Summary judgment is therefore appropriate in cases, like that here, which require the

Court to construe the meaning of a contract where "the contested agreement admits of only one

reasonable interpretation." *United Mine Workers of America 1974 Pension v. Pittston Co.*, 984

F.2d 469, 473 (D.C. Cir. 1993); *NRM Corp.*, 758 F.2d at 682 ("when the parties' intent is

'wholly unambiguous' on the face of the agreement, disposition on a motion for summary

judgment may be appropriate"). If the language of the contract has one clear meaning, that

---

[4]     The April 2000 Purchase Order specifically provides that the Order is to be governed and construed in accordance with the laws of the District of Columbia. *See* April 2000 Purchase Order, Attachment A ¶2, Lesmes Decl., Exh. 16.

meaning controls, and the Court must determine the intent of the parties from the language used. *Id.; E.P. Hinkel & Co.*, 506 F.2d at 204.[5]

In the First Count of the Complaint, ASCO seeks to subject PepTech to liability in breach of contract for "refusing to make payment" for the losses ASCO allegedly incurred when ASCO "beg[a]n acquiring material and production to comply with PEPCO's verbal production schedule." Complaint, First Count ¶¶14, 17, Lesmes Decl. Exh. 1. To succeed on its breach of contract claim, ASCO must prove that PepTech breached an agreement that proximately resulted in the damages it seeks in this case. ASCO cannot meet its burden because, under the clear and unambiguous language of the April 2000 Purchase Order, PepTech had no obligation to pay for losses derived from switches or materials that PepTech never authorized ASCO to acquire or manufacture.

The April 2000 Purchase Order expressly provides:

> *Deliveries are to be scheduled as requested in writing ("Ship Requests"), with production of units to be made to meet Ship Requests in the time specified in Attachment B. Ship Requests are to be of a size as specified in Attachment B.* Unless otherwise authorized *by prior written consent* by Purchaser, Supplier shall neither make *irrevocable* commitments for materials or services nor fabricate in advance of time necessary *to meet Ship Requests.* It is Supplier's responsibility to comply with *these terms*, but not to anticipate Purchaser's requirements.

UF ¶ 16, (emphasis added). Therefore, PepTech was not obligated to purchase -- and ASCO was not obligated to manufacture -- any of the 10,000 units referenced in the April 2000 Purchase Order unless and until PepTech submitted an order for units to ASCO in writing "at least 4 weeks prior to the required delivery date." Lesmes Decl., Exh. 16, Attachment A at ¶ 11,

---

[5]      The Court may consider extrinsic evidence of the parties' intent "only when the contract is not a complete and integrated writing [; but] parole evidence is admissible only when it does not contradict the terms of the writing, or is not otherwise inconsistent with it." *Travelers Indemnity Co. v. Booker*, 1986 U.S. Dist. Lexis 30945 at *8 (D.D.C. 1986).

Attachment B.  Indeed, the April 2000 Purchase Order expressly goes on to caution ASCO to

"*neither make irrevocable commitments for materials or services, nor fabricate in advance* of

time necessary to meet Ship Requests [project demand schedules]. . .[and] *not to anticipate*

*[PepTech's] requirements*." *Id.* (emphasis added).  Thus, the clear and unambiguous language

of the April 2000 Purchase Order "admits of only one reasonable interpretation":  any obligation

ASCO had to purchase materials for and manufacture the utility disconnect switches at issue in

this case, and any obligation PepTech had to pay for such switches and materials was expressly

conditioned upon ASCO receiving a request for manufacture "in writing" from PepTech; costs

incurred due to any unauthorized or advance material purchase or manufacture to be born by

ASCO.  *See United Mine Workers,* 984 F.2d at 473.

 Indeed, this interpretation is entirely consistent with the fact that PepTech was a start-up

company with no established customer base.  PepTech did not want to commit to purchasing

products until it had firm commitment from third parties for GenerLinks, at which point it would

issue a written release for manufacture, and ASCO did not want to be obligated to produce

product until there was an order in hand for which it would be paid.

 There can be no dispute, that PepTech never authorized the purchase of materials for, or

the manufacture of any of, the switches for which ASCO now seeks to hold PepTech liable.  It is

undisputed that Bradley Johnson, PepTech's authorized representative, never signed a Ship

Request or any other writing authorizing the purchase of materials or manufacture of switches at

issue in this case.  *See* Defendant Bradley Johnson's Objections and responses to Plaintiff ASCO

Power Technologies' First Set of Interrogatories dated May 24, 2004, Response No. 4, Lesmes

Decl. Ex. 26; UF ¶ 30.  It is further undisputed that no one else from PepTech ever made a

request in writing for the products and material at issue.  UF ¶ 31.

Indeed, the uncontroverted evidence in this case is that ASCO placed the April 2000 Purchase Order on "Hold for Release" (UF ¶¶21-22, 24), and never received a written authorization to acquire or manufacture the products at issue in this case.  UF ¶¶ 24-27.  As ASCO's district manager Jason Thorne explicitly confirmed:

> Q: Do you recall receiving written releases or authorizations from PEPCO to go ahead and ship products pursuant to the April 26, 2000 purchase order for 10,000 units?
> A: *I did not receive a written release from PEPCO for the April order, no.*
> Q: Do you know if anyone else at ASCO received such a release?
> A: No …. No, I don't believe we did. Not to my knowledge.

Thorne Dep: 74:20-75:6, Lesmes Decl. Ex. 9, UF ¶ 31 (emphasis added).  Thus, under the clear terms of the April 2000 Purchase Order, since PepTech did not make a written request for the product and materials at issue, ASCO was not obligated to purchase those materials or manufacture those switches; nor is PepTech liable to pay.

Lest there be any doubt, the April 2000 Purchase Order expressly placed the financial risk of any premature purchase of materials and advance fabrication (without a written request) on ASCO:  ASCO was obligated not to "make irrevocable commitments for materials", not to "fabricate [product] in advance" of a request, and "not to anticipate [PepTech's] requirements." UF ¶ 16.  Here, ASCO did just that.  Indeed, ASCO concedes in its Complaint that its claim for damages is based on the fact that it acquired materials and produced switches to comply with PepTech's "verbal production schedule."  Complaint, ¶ 14, Lesmes Decl., Exh.1.  It goes without saying that a "verbal production schedule" is not a written authorization or request for product.  To the contrary, the production schedules at issue here, were <u>tentative</u> forecasts – estimates – of potential needs.  Thus, ASCO did not acquire materials and produce switches based on a written demand as required by the purchase order.  Rather, ASCO did precisely what that purchase order

16

expressly admonished it <u>not</u> to do:  purchase materials and produce switches in anticipation of PepTech's requirements.

Not only is the purchase order's prohibition clear and unambiguous, ASCO understood this language and understood the consequences of its failure to comply with those terms. Specifically, on September 8, 2000, Mr. Thorne sent an internal email to various ASCO employees where he made clear:

> 1) This order was entered "HOLD FOR RELEASE" and anticipated request dates were included.  These dates are now a requirement for all "HOLD FOR RELEASE" orders and were our best projections possible at the time.  Due to some unforeseen complications and market setbacks, these dates had to be changed.  <u>PEPCO has not released any orders for manufacture</u> and they have been working with us on their forecast projections.  Now <u>we are turning to them and demanding that they except [sic] material on which they have not authorized manufacture.</u>  This was my concern in giving anticipated "customer request" dates, the factory would use these dates to manufacturer material and then force the customer to take delivery.  <u>WE CAN NOT DO THIS!!</u>.  The field will be forced to leave the "anticipated request" date off the order.

UF ¶ 27 (emphasis added). [6]

Moreover, the April 2000 Purchase Order expressly provides that "[n]o change to this Order shall be effective unless agreed to in writing in advance by both parties." UF ¶ 20.  It is undisputed that no written change to this Order altering the structure of obligations under the Order, was ever agreed to by the parties.[7]

Furthermore, the reading of the Order is entirely consistent with other provisions of the agreement such as the termination for convenience clause.  In that circumstance, PepTech, like

---

[6]     That ASCO brought this lawsuit in spite of Mr. Thorne's acknowledgement is particularly revealing as to the opportunistic nature of this lawsuit.  Not only did ASCO have on hand pre-existing inventory and parts that it sought to unload, UF ¶ 14, but Mr. Thorne's email reveals that a breakdown in communication between ASCO's sales office and its factory resulted in ASCO's factory prematurely manufacturing switches for PepTech when its sales office was aware that PepTech never released the switches for manufacture or shipment.  UF ¶ 27.

[7]     Even assuming, for the sake of argument, there was evidence of a verbal commitment for the release of switches, such evidence would be inadmissible since it contradicts and is inconsistent with the clear terms of the April 2000 Purchase Order. *See Travelers Indemnity*, 1986 U.S. Dist. Lexis 30945 at *8.

here, would only be liable for products that it had specifically requested for manufacture. *See* April 2000 Purchase Order, Attachment A, ¶18, Lesmes Decl. Exh. 16.

"Summary judgment cannot be defeated by the vague hope that something may turn up at trial." *E.P. Hinkel & Co.,* 506 F.2d at 205. (internal citations omitted). It cannot be said that PepTech breached any agreement by failing to pay for switches when the undisputed facts make plain that PepTech never authorized the manufacture of the switches in the first instance. Further, the language of the purchase order is clear: ASCO bears the financial risk of purchasing and manufacturing product in advance of such a demand. ASCO knew of this risk and ignored it. Thus, under the clear terms of the April 2000 Purchase Order, PepTech was not obligated to pay for the materials and switches now at issue. Indeed, this is the precise situation paragraph 11 of the April 2000 Purchase Order warned ASCO about and sought to protect against. As such, ASCO's breach of contract counts must fail as a matter of law.

III.   **PLAINTIFF'S MISREPRESENTATION AND FRAUD CLAIMS CANNOT WITHSTAND SUMMARY JUDGMENT AND MUST BE DISMISSED AS A MATTER OF LAW**

ASCO's misrepresentation and fraud claims are based on allegations that PepTech "made representations to [ASCO] as to the amount of disconnect switches that PEPCO would purchase from [ASCO] and as to the required delivery schedule for those switches," Complaint, Second Count ¶2, Lesmes Decl. Exh. 1, and that PepTech "made false representations to [ASCO] in connection with PEPCO's proposed purchase of disconnect switches for use in PEPCO's GenerLink Program." Complaint, Lesmes Decl. Exh. 1, Fourth Count ¶2. Not only can these claims not withstand legal scrutiny given the validity and existence of the April 2000 Purchase Order, but ASCO has not offered – nor can it – a shred of evidence to support these claims.

18

### A.   The April 2000 Purchase Order Precludes ASCO's Fraud and Misrepresentation Claims

It is well settled that a claim of fraud or misrepresentation fails where, as here, there is a valid agreement covering the same performance at issue in the claim. *See Regency Communic'ns Inc., v. Cleartel Communic'ns Inc.*, 160 F. Supp. 2d 36, 42 (D.D.C. 2001) (citing *Triple Point Technology, Inc. v. D.N.L. Risk Management, Inc.*, 2000 W.L. 1236227, at *5 (D.N.J. 2000)) ("general reluctance to allow a claim of fraud to proceed when 'the fraud contemplated by the plaintiff does not seem to be extraneous to the contract, but rather on the performance of the contract itself.'"). More specifically, to maintain a claim of fraud or misrepresentation in addition to a claim of breach of contract, a plaintiff must: (1) demonstrate a legal duty separate from the duty to perform under the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. *Regency Communic'ns*, 160 F.Supp.2d at 42. ASCO's fraud claims meet none of these requirements.

Here, the obligations of the parties are clearly defined by the April 2000 Purchase Order and ASCO's counts for fraud and misrepresentation are based on the performance of that contract. Indeed, ASCO has not alleged – nor can it demonstrate – that PepTech owed a legal duty to ASCO separate and apart from the contractual duty to perform under the purchase order. *Id.* As sophisticated businesses that negotiated at arms-length, PepTech owed ASCO no special duty, certainly no fiduciary duty, beyond the express agreement. The duty to provide a projected demand schedule, written authorization for production, or to purchase switches that ASCO claims was allegedly breached, arose solely from the contractual relationship between the parties; there is no tort duty that requires this behavior.

19

Furthermore, the alleged fraudulent and negligent representations – of which there is no evidence – are not "collateral or extraneous to the contract," but rather, fall squarely within the four corners of the April 2000 Purchase Order. *Regency Communic'ns*, 160 F. Supp. 2d at 42. PepTech's alleged submission of false information to ASCO about the "amount of disconnect switches" to be purchased, the "delivery schedule" for those switches, and the "purchases of switches for use in . . . the GenerLink Program" are issues squarely addressed by the April 2000 Purchase Order. Complaint, Lesmes Decl. Exh. 1. Indeed, they are specifically addressed by paragraph 11 of that Purchase Order. Lesmes Decl. Exh. 16.

Lastly, ASCO is seeking compensatory damages, not special damages that are unrecoverable as contract damages. *Id.* Consequently, ASCO's fraud and misrepresentation claims are duplicative of its breach of contract claim and must fail as a matter of law.

### B.    Even if the Fraud and Misrepresentation Counts are not Duplicative, Plaintiff Fails to Establish Essential Elements of the Claims

The law requires proof of five elements in order to recover for fraud: (a) a false representation of a material fact; (b) made with knowledge of its falsity; (c) with intent to deceive; (d) reasonable reliance on the misrepresentation; and (e) provable damages. *Railan v. Katyal*, 766 A.2d 998, 1009 (D.C. 2001); *Barrer v. Women's Nat'l Bank,* 761 F.2d 752, 758 (D.C. Cir. 1985); *Nader v. Allegheny Airlines, Inc*., 626 F.2d 1031, 1036 (D.C. Cir. 1980). "A promise or contractual commitment may be actionable as fraud if at the time of its making, the promisor had no present intention of carrying it out." *Bennett,* 377 A.2d at 60-61. A representation as to future events, however, that is made with the expectation that it will be carried out, gives rise to no cause of action for deceit or equitable relief. *Id.* Fraud is never presumed and must be established by clear and convincing evidence. *Hercules & Co. v. Shama*

*Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992); *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977),

*cert. denied*, 434 U.S. 1034 (1978).

To establish a claim for negligent misrepresentation, ASCO must prove that: (1) a false

statement or omission of a fact, (2) the statement was in violation of a duty to exercise

reasonable care, (3) the false statement or omission involved a material issue, (4) detrimental

reasonable reliance on the false information, and (5) proximately caused injury. *Burlington Ins.*

*Co. v Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 48 (D.D.C. 2004).

This Court must enter summary judgment in favor of PepTech if ASCO fails to raise a

genuine issue of fact concerning any one of these elements. *Celotex*, 477 U.S. at 322-323;

*Bennett*, 377 A.2d at 59-60 (to be entitled to a trial on the merits of a fraud claim, a plaintiff must

allege "such facts as will reveal the existence of all the requisite elements of fraud. Allegations

in the form of conclusions on the part of the pleader as to the existence of fraud are

insufficient."). Here, the proof necessary to support the elements of these tort causes of action

are blatantly and conspicuously absent. Indeed, ASCO has not -- nor can it -- establish any of

the elements, and as such PepTech is entitled to summary judgment as a matter of law.

### 1.    There Was no Misrepresentation

ASCO's fraud and misrepresentation claims fail because there is no evidence that

PepTech made any false statements, let alone false statements concerning its product needs. To

the contrary, the April 2000 Purchase Order is clear. It was a potential order for 10,000 switches

to be delivered during the term of the order depending upon third party customer needs and

commitments. The purchase order provided that PepTech would issue written requests

identifying specific quantities of switches to be manufactured by specific delivery dates. No

such written requests were ever made by PepTech for the products and materials at issues here.

Therefore, there can be no misrepresentation.

Furthermore, to the extent PepTech provided verbal forecasts of anticipated product needs, it was clear -- even to ASCO -- that such forecasts were tentative, subject to change and by no means, binding. Indeed, these forecasts were not, nor could they be, by definition, false. *See* UF ¶¶ 23. PepTech provided ASCO with tentative verbal forecasts, at ASCO's insistence, because PepTech did not have definitive projections, as they did not have firm orders, and the projections PepTech had were always changing. In fact, PepTech exercised due care to communicate to ASCO that its forecasts of projected sales and delivery dates were estimates, not firm commitments, based on the best information PepTech had available at the time. PepTech used words such as "approximately" and "could be" to communicate uncertainty to ASCO about those forecasts. UF ¶ 8. Significantly, ASCO, through Jason Thorne, acknowledged that these forecasts were not commitments and the projected dates that PepTech provided to ASCO were PepTech's "best projections possible at the time." UF ¶27. And, Mr. Thorne further confirmed that those projections were constantly changing due to uncertainties in the market. *Id.* Thus, there is no evidence of any misrepresentation.

### 2.    ASCO Cannot Prove That PepTech had Fraudulent Intent

ASCO cannot recover on its fraud claim unless the evidence establishes that PepTech intended to deceive ASCO when it entered into the April 2000 Purchase Order. *Bennett v. Kiggins*, 377 A.2d 57, 59-60 (D.C. 1977). Such intent is unsupported by the evidence and, as such, ASCO's fraud claim fails as a matter of law.

"A promissory representation, or a representation as to future events asserted in a common law fraud claim, should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur." *Bennett v. Kiggins*, 377 A.2d at 60-61. ASCO alleges that PepTech intentionally defrauded ASCO by purposefully misrepresenting PepTech's

future requirements for utility switches.  Such a conclusory statement unsupported by any evidence does not create a genuine issue of material fact.  *Id.*  Moreover, to accept ASCO's allegations as true would suggest that PepTech acted against its self –interest and never intended to develop or market the GenerLink from the outset, which undermines the undisputed fact that PepTech was formed as a company to advance the GenerLink.  *See* UF ¶ 2.

Furthermore, the evidence is clear that PepTech was trying to establish a market for its product, but that due to changes in the market, its forecasts were not accurate.  Indeed, Jason Thorne acknowledged PepTech's efforts in attempting to market its GenerLink product, as well as the difficulties PepTech was having due to market uncertainties.  UF ¶ 27.  This acknowledgement alone is sufficient to defeat ASCO's fraud claim.

ASCO's fraud claim is also insufficient because it is beyond genuine dispute that PepTech provided ASCO with *verbal tentative projections*, based on the best information that -- as ASCO acknowledged -- was available at the time, and which ASCO knew were subject to change.  Moreover, as discussed *supra*, the express language of the April 2000 Purchase Order prohibited ASCO from relying on PepTech's projections to fabricate materials or anticipate PepTech's requirement without prior written consent.

There is no evidence that PepTech made a representation or omission in connection with its performance under the April 2000 Purchase Order generally, or in connection with projecting its product needs, that was fraudulent when made.  *Bennett v. Kiggins*, 377 A.2d at 60.  As this Court made clear, "mere allegations [of fraud] without factual content will not suffice." *See Report and Recommendation* of Judge Susan D. Wigenton filed on September 17, 2004, at p.8, Lesmes Decl. Exh. 3.

3.     **ASCO Did Not Reasonably Rely on the Alleged Misrepresentations**

A party alleging that it was defrauded in the context of commercial dealings at arm's length must establish not only that it actually relied on a false representation, but also that its reliance was objectively reasonable. *Hercules & Co., Ltd., v. Shama Rest. Corp.*, 613 A.2d 916, 933 (D.C. 1992); *Democratic Nat'l Comm. v. McCord*, 416 F. Supp. 505, 508 (D.D.C. 1976) ("Not only must there be reliance [upon the misrepresentation at issue], but the reliance must be found to be justifiable under the circumstances. . . . [Even] where the plaintiff's reliance in fact, and his good faith, are unquestioned, it may still be held that his conduct was so foolish as to bar his recovery." W. Prosser, Law of Torts § 108, at 715-16 (4th ed. 1971)).  ASCO cannot prove the element of justifiable or reasonable reliance.

ASCO alleges that it relied on PepTech's representations about the amount of disconnect switches PepTech would purchase from ASCO and the required delivery schedule for those switches in producing switches to meet PepTech's delivery requirements.  Complaint, Second Count, ¶¶2-3, Lesmes Decl. Exh. 1.  This argument is belied by the facts.

First, the evidence establishes that ASCO did not rely on any false or misleading representation in acquiring materials and manufacturing the switches at issue here.  Rather the evidence show that ASCO's factory misunderstood the documentation supplied to it concerning the PepTech Purchase Order and mistakenly manufactured switches.  As Jason Thore wrote: "PEPCO has not released any orders for manufacture . . . . Now we are turning to them and demanding that they except [sic] material on which they have not authorized manufacture.  This was my concern in giving anticipated "customer request" dates, the factory would use these dates to manufacture material and then force the customer to take delivery."  Lesmes Decl. Exh. 22; UF ¶ 27.  Indeed, Jason Thorne states:  "WE CANNOT DO THIS."  *Id.*  Nor can ASCO now claim this production of product was based on reasonable reliance.

24

Second, even without Jason Throne's acknowledgement and leaving aside the fact that there were no misrepresentations made, ASCO's reliance was patently unreasonable. The undisputed facts demonstrate that ASCO knew: (i) PepTech was a startup company with no established customer base; (ii) PepTech had to authorize the manufacture of switches in writing; (iii) the April 2000 Purchase Order prohibited ASCO from making irrevocable commitments, pre-fabricating materials or anticipating PepTech's requirements; and (iv) PepTech's projections were not specific requests for products, but rather were tentative estimates of need, subject to change due to market fluctuations, and which in fact, did change. Indeed, Mr. Thorne testified that ASCO "*had been receiving ongoing forecast release schedules, but … – they were constantly changing.*"[8] Thorne Dep. 71:10-12, *see* Lesmes Decl. Exh. 9. (emphasis added); *see also*, email from Jason Thorne to Richard Mayock re: PEPCO Technologies – tentative release schedule dated January 31, 2001 (000100) ("I have talked with both Michael Bufalini and Mark Baird at PEPCO and they are looking at the following *tentative* release schedule …This is *subject to change*, because California has asked for several thousand of these, but no one wants to sell to a Bankrupt utility"), Lesmes Decl. Exh. 18, UF ¶ 23 (emphasis added).

In speculating about the probability that PepTech's projections would amount to firm commitments, ASCO took a calculated business risk and failed in its efforts. Therefore, any losses ASCO allegedly suffered were caused by its own poor judgment, not reliance on any alleged misrepresentations concerning PepTech's projected schedule. As a sophisticated well-established company engaging in an arm's length transaction with a start-up company, it was unreasonable for ASCO to rely on PepTech's *tentative verbal* projections to pre-manufacture switches given not only the uncertainties of the business, but the express contract term

---

[8]    Mr. Baird testified that the time and quantity parameters of any forecast that PepTech made "was constantly changing." Baird Dep. 36:11-16, Lesmes Decl. Exh. 8.

prohibiting such conduct.  In short, ASCO did not reasonably rely on any representation PepTech

made.  Given that ASCO has no proof to support any of the elements of its fraud and

misrepresentation claims – indeed, there is none – these claims must fail.

## IV.  PLAINTIFF'S ACCOUNT STATED CLAIM FAILS BECAUSE PEPTECH NEVER ACKNOWLEDGED THE VALIDITY OF THE ACCOUNT

The law is well-settled that an account stated "presupposes *an absolute acknowledgement*

*or admission of a certain sum due, or an adjustment of accounts between the parties, the striking*

*of a balance*, and *an assent*, express or implied, *to the correctness of the balance*." *Falcone v.*

*Paradiso*, 54 F.2d 715, 717 (D.C. 1931) (emphasis added); *Dawn v. Stern Equipment Co.*, 134

A.2d. 341, 342 (D.C. 1957)(same); *Reed Research, Inc. v. Int'l Concrete Corp.*, 243 F.2d 602,

604 (D.C. Cir. 1957) ("The essence of an account stated is a finding … [that]  the parties at some

point agreed that a particular amount was due and owing."); *National Realty Corp., v. Impact*

*Advertising Inc.*, 206 A.2d 579 (D.C. 1965) ("A balance must have been struck in such

circumstances as to import a promise of payment on the one side and acceptance on the other");

*Exxon Corp. v. Int'l Concrete Corp.* 335 A.2d 236, 237 (D.C. 1975) ("the party charging and the

party to be charged have agreed or struck a balance from which an obligation to pay can be

implied").

There can be no claim for an account stated, where, as here, there is no agreement

between the parties as to the amount of the alleged balance and the party to be charged, PepTech,

has not acknowledged the validity of the sum allegedly due.  The undisputed facts make clear

that PepTech never admitted the correctness of the account, nor admitted owing any amount.  To

the contrary, PepTech emphatically rejected the invoice ASCO submitted to PepTech and denied

any financial obligation for the unauthorized acquisitions which form the basis of the alleged

balance. UF ¶ 41. Therefore, no acknowledgement of the validity of the alleged balance occurred.

Nor can an account stated be implied in this case. The mere rendering of an account to PepTech does not make it a "stated account" since PepTech timely objected to the correctness of the amounts owed. *See First National*, 206 A.2d at 580 (mere sending of bills imported no promise of payment and mere retention of bill does not always imply an admission of its correctness and a promise to pay). Accordingly, ASCO's account stated cause of action fails as a matter of law and must be dismissed.

## V.  PEPTECH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR QUANTUM MERUIT

ASCO's *quantum meruit* claim also fails because ASCO has pleaded an express contract, the April 2000 Purchase Order, and therefore cannot recover on a quasi-contract without showing a rescission of that contract. *Duffy v. Charles Schwab & Co., Inc.*, 123 F. Supp. 2d 802, 814 (D.N.J. 2000) ("[q]uasi-contract liability will not be imposed when a valid, unrescinded contract governs the rights of the parties.")

The law is clear in New Jersey that recovery based on a quasi-contract theory is mutually exclusive of a recovery based on a contract theory:

> It is a well settled rule that an express contract excludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject. The parties are bound by their agreement, and there is no ground for implying a promise. It is only when the parties do not agree that the law interposes and raises a promise. When an express contract exists, there must be a rescission of it before the parties will be remitted to the contract which the law implies, in the absence of that agreement which they made for themselves.

*Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280-281 (1951) (internal citations omitted)

The law of the District of Columbia is in accord:

> There is no need to resort to a quasi-contract claim based on *quantum meruit* if a true contract was in existence at the time the services were performed …. When

> parties enter into a contract[,] they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasicontract for recovery. This the law will not allow.

*Dale Denton Real Estate v. Fitzgerald*, 635 A.2d 925, 928 (D.C. 1993)(internal citations omitted).

It is undisputed that ASCO has an express purchase order with PepTech and, indeed, has sued PepTech for its alleged breach. Having acknowledged the validity of the contract in its breach of contract claim, an additional claim for *quantum meruit* cannot lie and must be dismissed.

Even if a *quantum meruit* claim can be sustained, which PepTech submits it cannot, the claim still fails. To recover under a *quantum meruit* theory, ASCO must prove: (1) that it rendered valuable services to PepTech, (2) which PepTech accepted, and (3) that ASCO reasonably notified PepTech that ASCO expected to be paid by PepTech. *See Dorsky Hodgson & Partners, Inc. v. Nat'l Council of Senior Citizens*, 766 A.2d 54, 58 (D.C. 2001). To make out its claim, ASCO must not only prove that it conferred an advantage upon PepTech, but also must demonstrate that retention of the benefit without compensating ASCO is unjustified. *Bloomgarden v Coyer*, 479 F.2d 201, 211 (D.C. 1973).

ASCO's claim for *quantum meruit* fails because, as discussed *supra*, PepTech never released the disputed switches for manufacture or delivery. Thus, ASCO never shipped, and PepTech never took possession of, the completed switches or unassembled units prematurely manufactured and acquired by ASCO. As such, PepTech has not accepted the goods or services at issue in this lawsuit. Indeed, ASCO still possesses those items and it is believed that ASCO

has sold to Global Power the very items for which it seeks compensation from PepTech here.

Thus, ASCO's claim fails and PepTech is entitled to summary judgment as a matter of law.

## **CONCLUSION**

For the reasons demonstrated above, plaintiff's claims are not trial-worthy, and PepTech

respectfully requests that their motion for summary judgment be granted.

Date:  September 9, 2005                              Respectfully submitted,


                                                     THELEN REID & PRIEST LLP


                                                     Julie L. Friedberg, (JF 6932)
                                                     200 Campus Drive, Suite 210
                                                     Florham Park, New Jersey  07932
                                                     973-660-4405

                                                     *Attorneys for Defendant Pepco Technologies, L.L.C.*

*Of Counsel:*

THELEN REID & PRIEST LLP

Melissa Lesmes, Esq.
701 Pennsylvania Avenue, NW, Suite 800
Washington, D.C.  20004
202-508-4000